Mr. Sawyer, whenever you're ready. Thank you. May it please the Court, I'd like to reserve three minutes for rebuttal, if I may. My name is Doug Sawyer and I represent the Intermec Parties. The appeal of two patents today comes down to one key dispute, whether the District Court erred in importing limitations from the specification into the asserted claims. I'd like to start with the 807 patent, if I may. The 807 patent is not limited to a battery power tag. Before you go any further, just quickly, both of these patents are expired, is that right? That's correct, Your Honor. Okay. Are there any other pending litigations besides this one involving these two patents? No, Your Honor. Okay. I'd like to start with the 807 patent. It's not limited to a battery power tag or a tag-talk-first system for three reasons. First, the claim language does not support or require either. There is simply no textual hook to require those narrowing limitations. Two, the prosecution history, claim differentiation, and prior litigation support the broader construction. And three, the patent did not clearly disavow any of the three claimed inventive concepts and claimed each inventive concept to a different degree in the patent. Alien all but concedes the first two points. Instead, it focuses on the specification's use of the invention or the tag. Does it really all but concede the first two points? I mean, I thought you, the patent owner, over 10 years ago in a litigation said, yes, all of these claims are a tag-talk-first patented technology. And now you're here telling us, no, this could also be reader talks first. So there is an interrogatory response in an earlier case, the SCS case, in which counsel was describing the continuous self-identification and capability to self-identify. And at that interrogatory, it talks about that particular limitation and says it is a tag-talk-first invention. If this invention requires a continuous self-identification or continuous scrolling, then it would be a tag-talk-first. But the inventor, if you look at the patent specification, describes three inventive concepts. And three inventive concepts, and Alien recognized in an earlier brief, and we cited on our opening brief 46 to 47, that one of the inventive concepts is the verification and selective transmission. The verification and selective transmission of the tag and the reader prevents overwriting of the tag. And when the patent describes that specific inventive concept, what if- If I were to say I read this patent and it was trying to overcome a limitation in the prior art, and the limitation of the prior art was that the prior art required the reader to talk first. And starting up the communication between the reader and the tag with the reader talking first consumed valuable time in the short amount of time you have for these two devices to talk to each other. So it came up- So the invention came up with the idea of the tag talking first, where the tag is continuously scrolling, self-identifying itself, so that when it comes within RF range of the reader, the reader will immediately be able to pick that up and then identify the tag and then be able to quickly send information and data over to the memory of the tag. And that's what this invention is about. I don't quite understand what you're talking about when you say there are multiple different inventive concepts here. The patent's not that long. It is not that long, Your Honor. I've seen longer. And I agree with you. That is one inventive aspect of the invention. And so just for background, tag talk first, reader talk first, remote battery powered tags and active tags or passive tags, all were in the prior art. So it is not the idea that just being a tag talk first is inventive. There was tag talk first systems prior to this invention. What this invention does is it improves upon the prior art and it improves upon the prior art in three specific ways. The first, which is what's at issue in Claim 4 and what is supported by the plain language of Claim 4, is this verification and then selective transmission, which has the interrogator recognizing a particular tag and sending information only to that particular tag. Now, in fast moving systems, you do that when the tag is self-identifying itself by continuously scrolling. And then the reader sees that and then understands what's the nature of this tag. And therefore, the reader knows what kind of data, if any data at all, to transmit to the tag. Right? Yes and no, Your Honor. So if you look at the claim language or even, say, the abstract, when it talks about this specific inventive concept, it talks about the tag backscatter modulates the received signal with data temporarily and permanently stored in the tag. That's true. But if you look at the preceding sentence, it says, an interrogator sends an RF signal to a remote tag, the signal including data intended to be received and stored by the tag. So just even in the abstract and in the same plain language, this is talking about that specific reader and tag interaction is talking about something later in the communication cycle. If we read the first two limitations the way you want us to, and I understand that there's a reason to do that. The reader sends a modulated RF signal with data for the tag to store and the reader does that first. And then the tag would backscatter modulate that already modulated RF signal back to the reader. Is that right? I guess what I'm wondering is how would that work? How would you be able to send a coherent backscatter modulated signal back to the reader when it's relying on an already data modulated signal? Certainly, Your Honor. I think the claims and if you look at the patent specification and even some of the figures. There's nothing in the specification that contemplates doing that, right? The whole idea is you get a continuous wave RF signal unmodulated coming in from the reader. And then the tag takes that signal unmodulated and then backscatter modulates it back to the reader. No, Your Honor. I believe there is a contemplation in the specification in which it talks about. Obviously, there is a contemplation where it's a tag talk first where the interrogator is just sending a continuous wave unmodulated and the tag responds. But if you look at, for instance. The let me flip to it here. The in column four of the 807 patent in step 13 of figure one, the interrogator recognizes. I'm sorry, we're in column. I'm sorry. Column for line 24. Yes. In step 13 of figure one, the interrogator recognizes that there is a read write tag in its range. The sensitivity that the tag has been increased. And so I guess probably a little bit further down. Whereas, as indicated in step 14, the interrogator then checks to see if it has a message for that tag. Having already received the read write the read the tags identification, the interrogator compares and then sends back. But the the way in which the tag and reader communicate is once the tag identifies itself, the interrogator can receive information, send it back. And there's a I think there's more than I'm trying to find an embodiment in here where before the tag starts talking to the reader. The reader is already sending data to a not yet identified tag for that not yet identified tag to store that data in the tags memory. I don't think I'm going to find that in the in the nine columns here. Right. I don't think you're going to find that specific what you're asking for that specific sequence of of communications. But what you will find in here is a tag. And in the description of the prior art as well, that there can be reader talk first or tag talk first. And if the reader talks first, it will send a communication to the to the tag that is modulated. Reader talk first. That would be the what the Tenok patent described in the background. Yes. That the specification distinguishes away from why it doesn't want to be like Tenok. So it doesn't want to be like Tenok in this particular in that inventive concept, because that inventive concept is talking about the fast moving at column two around 18 to 21. It's talking about in a fast moving system. You really want to limit the or expand the time in which you're in right. The right mode and limit the handshake. That's true. And you want to do that with a tag talk first and continuous scrolling. I was going to say you accomplish that with the continuous scrolling, correct? You do. That's what the patent specification teaches. That's true. And in claim two and claim seven through 11, they claim that they claim this continuous scrolling and and self-identification. But in claims one, which has now been canceled by claim four, they exclude that and they only talk about this verification and self verification and selective transmission, which the patent recognizes is an advantage over the prior art because it permits or it it it stops overriding of information for a tag if you don't have that particular information for that tag. And so that's the best argument is that the second limitation for the remote object makes reference to upon receipt of said RF signal. So it uses the the signal said, but what's wrong with what your friend on the other side points out about the last limitation of the claim, which explains really the entire sequence of the signals going back and forth between the reader and the tag, and that it becomes quite clear expressly so that the reader doesn't send any data to the tag for the tag to store in its memory until after the tag itself sends the self-identifying information to the to the reader. Well, I think that the claim language itself doesn't exclude the reader talk first system. So there could be communications before that communication protocol starts. So that's the that's the right protocol. But there could be and there could there certainly is other transactions or other signals that are that are contemplated by the invention that are not listed in the claim. I think alien even recognizes that this claim claim for is covering a subsection of the overall communication protocol that's described in the patent. And so I don't think the patent that that claim certainly it shouldn't be limited to tag talk first. It contemplates both tag talk force or reader talk first. You're into your rebuttal. Do you want to put a quick marker down on any other argument or I want to save your time? I will just give maybe just one minute on the the 80 the 181 the 181 comes down to really whether or not all the tag functions need to need to be operable during a frequency. The claim requires less. The claim requires that that there be a tag energy store that collects rectified energy. The district court found that the persistent nodes do collect rectified energy. They do survive a frequency up and that those persistent nodes keep the flags. Those nodes supplying energy to any other electronic piece. There is evidence in the prior in the at the district court level or is it merely just holding on to whatever energy it has. So during the frequency hop it holds the energy and it holds the energy for a specific reason so that it maintains the flags during the frequency up so that you can restart communication protocol without a malfunction. After the frequency hop I think there is evidence to suggest that the that the tag energy that the nodes provide energy to other parts of the electronics. I thought it was your position that the tag electronics are the flags themselves. Certainly the tag electronics would include could include the flags themselves. The tag electronics I think are are a broad subset of electronics on the tag that are used to the tag to function. But they the persistent nodes are also collecting rectified energy and a tag energy store. Okay, thank you. From the other side. Thank you. May it please the court. I'd like to begin on the 807 patent and address Judge Chown's questions about the claim language. Because I think that the arguments that InterMEC has made with the claim language illustrate that this is a patent that only discloses one invention. Repeatedly describes that invention as an invention that is a tag talks first system that has this continuously scrolling feature. And there are nine different instances in the patent specification where this is described as the invention the present invention. The argument that they've made with regards to the claim language. And this is from their brief reply brief of page 16. They state that the wording of the claim actually supports their view that this is a reader talk for a system because it requires quote. The tag remote object to respond to the reader interrogator. Quote upon receipt then quoting the language from the next paragraph of the claim of a modulated signal from the reader. We absolutely know and this was not argued below. This is incorrect. This cannot be how the system works. Because. If you read the first two limitations that's how it seems to read. It is. I will. If you read those two limitations together the interrogator sends the RF signal. And that signal includes data. And then the remote object upon receipt of said RF signal. Backscatter modulates that signal. Correct. That's how it reads. It does read that way your honor. But it's unintelligible that way. And I'll explain why. Because it's referring in that first phrase. I'm not disagreeing with you that it's unintelligible. But if that's the way they wrote it that's maybe what they get. But it can't be what they get. And let me explain why. Because when they say an interrogator for sending an RF signal to said remote object. Said signal including data intended to be received and stored by said remote object. Received and stored is referring to the right operation. The right operation has nothing to do with reader talks first or tag talks first. Reader talks first and tag talks first is not about writing. It's about identifying. The question is, is there a command signal? Which is not stored. Command signals are not stored. It's whether the interrogation comes from the tag voluntarily backscattering an unmodulated signal. Or it gets a command that asks it to modulate a signal. It has nothing to do with what this is talking about. This is talking about writing. Right. So maybe as absurd as it sounds. The claim calls for a reader talking first as well as writing first before the tag ever does anything. Well, that can't be the case, Your Honor. Because then it goes on to say that the remote object upon receipt of said RF signal backscatters said RF signal with its identification information. And as Your Honor pointed out, at the end of the claim, it specifies that before any data can be stored and received by the tag, the tag must have first identified itself. So it would be completely, be pointing past each other and be completely inconsistent. So when the claim says said RF signal, I guess you want us to read that to mean an RF signal, right? I think, Your Honor, when it says… There's no way to read said RF signal as you normally would as a patent lawyer. That's what you have to be saying to me. Or the only intelligible reading I can have of the second phrase, said signal including data intended to be received and stored by said remote object, is as a further modification of what it's describing as the functionality. An interrogator for sending an RF signal to said remote object, said signal including data intended to be received and stored by said remote object, that is the functionality of the interrogator in the system. So that ultimately, the interrogator is intending to send information to be written. But when it then goes on to discuss what happens, it's clear that the backscatter modulated signal is a backscatter modulated signal of the identification information, which must precede the storage and writing of the information. Otherwise, the claim makes no sense. It seems like you could have sought to invalidate this claim for indefiniteness. Because the claim is at war with itself. When it talks about said RF signal at the top and then at the bottom, it talks about a completely different sequence of steps that goes on in the communication process. And, Your Honor, just to point out how the support for our reading of the claim, there's no support for their reading of the claim. But we know from several sources that this must be talking about the identification preceding the writing. And that's in the last paragraph of Claim 4, as Your Honor noted. In the brief description of the invention at Column 3, Lines 1 to 2, it states the interrogator, quote, recognizes the identity of the remote object from the returned backscattered signal and transmits data to the remote object only if the interrogator has data to be transmitted to that particular identified remote object. Figure 1 has Steps 14 and 15, which are the steps of sending the data, occurring after Steps 10 and 11, which are the tag identification. Column 4, Lines 29 through 32, states the interrogator then checks to see if it has a message for that tag. This is what counsel referred to in his argument. It says the interrogator then checks to see if it has a message for that tag, having already received and read the tag's identification. There is only one way that this patent ever describes what happens. Identification first, writing second. And that's separate from reader talks first, tag talks first. Reader talks first, tag talks first is just how does the identification occur? So that language about the data to be stored and written in the tag, that can't be the first thing that happens. Nothing in the patent supports that. And their own expert below admitted this. This is at the appendix 1564. I'm not disagreeing with you, but what you're describing is perhaps a written description defect, that this claim as written, at least the first two limitations, if you read them together, have no written description. I don't think it's simply – there may well be a written description problem, too, but there's also an issue of claim construction. We think the court properly construed the claims wrong because this – the other side argued that we cited cases that kind of talk past each other as to when you read descriptions of the invention and the specification as requiring certain things in the claims. We would submit if the court reviews those cases carefully, they are actually harmonious and can be reconciled. Why isn't this a situation where the specification is just listing three or four reasons why the prior art is distinguished and it's not fair to limit the claims to just one of those or any one of those without the plain claim language making it explicit? Because respectfully, Your Honor, I don't think that's what the patent does in the background section. In the background section, it describes the Hennick prior art system, which is a prior art system. So they claim that there's this independent verification selective transmission, but Hennick did that. This is what the patent says about Hennick. It says that – so this is column 1, line 60 to column 2, line 3. This is describing the prior art. The interrogator at the remote receiving station first transmits to the tag prior to being able to identify the tagged object and prior to transmitting any information bearing signals to the tag an interrogation command signal. The signal tells the tag to transmit the identification data stored in the tag's memory to the transmitter. After the interrogator recognizes this identification data, it sends a key signal to the tag to enable a write. That's the prior art. That is describing verification and selective transmission. The only difference, as the background of the section goes on to state, is that this occurs in a reader talks first system. And they have taken a position where they have said, well, you can have – there's nothing in here that says you can't have a wake-up command. That's completely inconsistent with the description of the invention. This is at column 5, lines 11 to 21, where it states, the signaling sequence of the invention has considerable advantages over the prior art sequence, which requires the interrogator first to wake up the tag before the interrogator can identify it. Again, it's referring to the invention. And this court's absolute – I would submit to the court that the absolute software case takes these separate lines of cases, and it looks to where you're describing something as the invention or the present invention. And it states where you do that consistently. There's a public notice component to a patent. Do you also rely on the language in column 3, lines 32 to 33, where it says, unlike the tags of the prior art, the tag of the invention continuously scrolls through the data in its memory? Is that something you also rely on here for your claim construction? Column 3 lines – I'm sorry, Your Honor, which lines? It looks to be around line 32. It's right under the detailed description of the invention? Yes. Yes, and that is describing a way in which – so the way this works is that continuously scrolling is one way that you can further shorten the time for the tag to identify itself. And I would refer the court – there's an article in the record which is a commercial embodiment of the invention. That's at A63958, and it talks a little bit about the scrolling. And what it indicates is that when you scroll, so you're constantly sending this memory. You're sending the identification information. That means that the reader is getting frequent identification signals. So if there's a problem, if there's a weak signal, and if some of them fail, you increase the chances that you're going to get the signal. So that's a way to do it is the scrolling, which it describes as the way that the invention does it. But it's somewhat – it's not completely coextensive with tag talks first because a tag could talk first without necessarily doing this continuous scrolling. All this continuous scrolling discussion throughout the specification, that really goes to your argument why the tag, the recited tag, is a battery-powered tag. Yes, yes. Does – do you need to win on both claim construction debates for the – for there to be an affirm here? No, Your Honor. Or either one? Either one, Your Honor. They've conceded that we do not have a tag talk first system. We have a reader talks first system. And that's why I went to that first because I think that's the clearest disclosure. I think the district court was right on both grounds. And your tags lack a battery or a power source? Correct, correct. They are passive tags. Because they're passive. Yes, yes. So very quickly, Your Honor, unless there are further questions on this – I just also wanted to point out just to clarify for the record, I think it's now conceded that they have pointed to figure three as not disclosing a battery. It's very clear if the court reviews the discussion of figure three in the context of the patent, although the battery is not depicted there, the embodiment that's depicted in figure three has a battery. And that is – Does everyone agree that if a tag is continuously scrolling, that necessarily translates to a tag that has its own power source? Yes, and they do not dispute that. They concede that. I also would just very, very briefly point out to Your Honors that their argument that this is a – somehow there are separate independent inventions – I mean, there is certainly a case law you can have separate independent inventions described in the specification that have different features. The selective transmission and verification, as I mentioned, that was in the prior art. They describe it as being in the prior art. And the portion that Intermec has cited to as disclosing the supposedly completely independent invention, at column seven, lines 33 through 34, the verification procedure prevents a tag being overwritten with the wrong data. If the court looks at the earlier part of that paragraph, this is again in the context of a scrolling tag. Just look a few lines up in lines 23. It says the tag then recognizing the command one pulse causes the scrolling to stop. And as they've conceded, scrolling requires a battery. So this is not describing some independent reader-talk-first verification invention. It's describing it in the context of what the patent over and over and over again says is the invention, which is a tag-talks-first system. Very, very briefly, if I have any time in my two minutes, I just wanted to address the 181 unless the court has any further questions on the 807. So on the 181, I wanted also to go to Judge Chen's questions about the evidence concerning, I believe it was Judge Chen, it might have been Judge Stahl, about the questions about whether there is any delivery of power from these capacitors, from the persistent nodes to the tag electronics. And the answer is... It's the power-off period. Well, it's undisputed that during the power-off period, there isn't any. They concede that. And that's the only relevant period of time for the... In our view, it is. ...anti-depletion limitation. In our view, it is. But I just want to address their arguments because even under their arguments, we still should have an affirmance. So they say that if the persistent node circuit delivers power after the power comes back up, that that's okay because it's allowing the tags to function. There's no evidence in the record that suggests that that ever happens. The claim term requires that there has to be a tag energy store and a means for delivery of energy from the tag energy store to the tag electronics. There's no evidence that that happens. They cite to Appendix 13-13516. And all their expert says there is he's describing what capacitors do. He says it's holding a charge. He says it's really powering the state retention circuit in effect. But he was then asked, it's providing power to the persistent node circuit? Yes. So it's allowing current to flow through that circuit under certain conditions because there's a switch that isolates that capacitor to stop the charge from leaking away. And I would refer the court to Joint Appendix 19069 because what this persistent node circuit is, it's a capacitor which holds power, and it's two transistors. And all the transistors do is prevent the capacitor from leaking. That's what he's saying is power. It's just the means by which it holds its power. It doesn't deliver power to anything else in the tag. And where they refer, and this is also in Joint Appendix 19000 where the CTO of Alien describes how this works. And I see I'm out of time, but I would just also refer the court to Appendix 13517 where their own expert admits that what gets powered is when the power comes back up, our reserve capacitor, which is a separate component they do not claim as the tag energy store, that supplies power to the persistent node circuit, not the other way around. There's no delivery of any energy going from this persistent node circuit to any other part of the tag electronics. Okay, thank you. Thank you very much. Thank you. Two minutes for Mr. Sawyer. I'd just like to address this idea that the 807 patent does disclose different inventive concepts. In fact, in Alien's opening claim construction brief at Appendix 9694, they say a key feature of the 807 invention is that the data to be written into the tag is sent to and received and stored only a previously identified tag for whom such information is intended. It says, in other words, the data is transmitted to only one tag, is received by only one tag, and is stored by only one tag. So they are recognizing that that is one of the key inventive aspects of the invention. And the patent examiner also recognized that there are independent reasons for allowance of this particular patent. One was a continuous scrolling. And the second was this idea that there's a recognition by the interrogator of the remote for which the Lastly, with respect to Alien's discussion of whether or not the tag energy store delivers power to the tag electronics. Admittedly, there's not a lot in the record about that, but that's because the claim construction was really focused on what is a tag energy store and really what does it mean, this depletion limitation? What does it mean that tag electronics don't function? And so there wasn't a whole lot of discussion in the record about specifically if it gets delivered. There is evidence in the record, though, that Alien's, excuse me, that Intermex experts said that there is power that the tag energy store delivers to other tag electronics. And Judge Chen mentioned whether or not it is during power off or not. There's nothing in the claim that says the delivery has to be during the power off period. It just says it has to deliver energy with that. Did you say A9257? For the examiner? Yes. Okay. Thank you. The case is submitted.